# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

THERESA VIEIRA,

        Plaintiff,

v.                                     Case No. 5:19-cv-663-JRK

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

_____

## OPINION AND ORDER[1]

## I.  Status

Theresa Lima Vieira ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying her claim for disability insurance benefits ("DIB"). Plaintiff's alleged inability to work is the result of "[o]steoarthritis," "[b]ack injury – sciatic nerve pain," "[d]iabetes [t]ype 2," and "[o]verweight." Transcript of Administrative Proceedings (Doc. No. 15; "Tr." or "administrative transcript"), filed May 15, 2020, at 62, 73, 85, 212.

Plaintiff filed an application for DIB on December 1, 2016,[2] alleging a

---

[1]    The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 14), filed May 15, 2020; Reference Order (Doc. No. 16), entered May 18, 2020.

[2]    Although actually completed on December 1, 2016, see Tr. at 177, the protective filing date of the DIB application is listed elsewhere in the administrative transcript as November 30, 2016, see, e.g., Tr. at 62.

disability onset date of November 1, 2016. Tr. at 177-83.[3] The application was denied initially,[4] Tr. at 62-82, 83, 101-03, and upon reconsideration, Tr. at 84-95, 96, 105-09.

On December 10, 2018, an Administrative Law Judge ("ALJ") held a hearing, during which he heard from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). See Tr. at 32-61. At the time of the hearing, Plaintiff was 49 years old. Tr. at 34 (providing date of birth). On January 28, 2019, the ALJ issued a Decision finding Plaintiff not disabled through the date of the Decision. See Tr. at 12-22.

Thereafter, Plaintiff requested review of the Decision by the Appeals Council, Tr. at 175-76, and submitted additional evidence in the form of a brief authored by Plaintiff's counsel, see Tr. at 4-5, 263-66 (brief). On November 5, 2019, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, making the ALJ's Decision the final decision of the Commissioner. On

---

[3]     Plaintiff also applied for Supplemental Security Income ("SSI") on December 2, 2016. Tr. at 184-92, 193. The administrative transcript contains Plaintiff's application for SSI, but contains no other document related to SSI. The ALJ's Decision likewise does not mention SSI. Neither Plaintiff nor Defendant mentions SSI in any documents before the Court. Accordingly, the Court does not discuss SSI or any findings related to Plaintiff's application for SSI.

[4]     There are two copies of the Disability Determination Explanation (at the Initial level) contained in the administrative transcript. See Tr. at 62-82. In the first copy dated January 17, 2017, the "Application of Medical – Vocational Rules: Other Work" is completed. Tr. at 70-71. In the second copy dated January 18, 2017, this same section states that "[t]his section has not been completed for this claim." Tr. at 81. This difference in the two copies is noted, but it does not affect the determination made by the undersigned.

December 30, 2019, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff asks the Court to "set aside the [ALJ's D]ecision because it is not supported by substantial evidence." Plaintiff's Memorandum of Law (Doc. No. 19; "Pl.'s Mem."), filed July 16, 2020, at 1. Specifically, according to Plaintiff, the Decision does not provide good cause for rejecting the opinions of Plaintiff's treating physician, Dr. Julia O'Malley-Keyes. Pl.'s Mem. at 7-12. On September 11, 2020, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 20; "Def.'s Mem.") addressing Plaintiff's contentions.

After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned finds that the Commissioner's final decision is due to be affirmed.

## II.   The ALJ's Decision

When determining whether an individual is disabled,[5] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant

---

[5]       "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

(1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. § 404.1520; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four, and at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the five-step inquiry. See Tr. at 14-21. At step one, the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since November 1, 2016, the alleged onset date." Tr. at 14 (emphasis and citation omitted). At step two, the ALJ found that Plaintiff "has the following severe impairments: osteoarthritis of the left knee, diabetes mellitus, hypothyroidism, and morbid obesity." Tr. at 14 (emphasis and citation omitted). At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 15 (emphasis and citations omitted).

The ALJ determined that Plaintiff has the following residual functional capacity ("RFC"): "[Plaintiff can] perform light work as defined in 20 [C.F.R. §] 404.1567(b) except she is able to frequently climb ramps and stairs; occasionally

4

climb ladders, ropes, or scaffolds; occasionally use foot controls with the left lower extremity; and occasionally kneel, crouch, and crawl." Tr. at 16 (emphasis omitted). At step four, the ALJ relied on the VE and found that Plaintiff "is capable of performing past relevant work as an administrative clerk." Tr. at 19 (emphasis and citations omitted).

Although the ALJ found Plaintiff can perform her past relevant work, the ALJ further made alternative findings. Tr. at 20. In the fifth and final step, after considering Plaintiff's age ("46 years old . . . on the alleged onset date"), education ("at least a high school education"), work experience, and RFC, the ALJ again relied on the VE and found that "there are other jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform," Tr. at 20-21, such as "Laundry Worker," "Price Marker," and "Information Clerk," Tr. at 21. The ALJ concluded that Plaintiff "has not been under a disability . . . from November 1, 2016, through the date of th[e D]ecision." Tr. at 21 (emphasis and citation omitted).

### III.   Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. § 405(g). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence.'" Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial

evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); see also Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019); Samuels v. Acting Comm'r of Soc. Sec., 959 F.3d 1042, 1045 (11th Cir. 2020) (citation omitted). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (citation omitted). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence—even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV. Discussion

### A. Parties' Arguments

As noted, Plaintiff argues that "the ALJ did not offer good cause for rejecting the opinion of Plaintiff's treating physician, Dr. O'Malley-Keyes." Pl.'s Mem. at 1, 7. Specifically, Plaintiff asserts that (1) the ALJ wrongfully ignored Dr. O'Malley-Keyes's opinion that Plaintiff cannot ambulate without difficulty;

(2) the ALJ erroneously rejected Dr. O'Malley-Keyes's diagnosis of carpal tunnel syndrome ("CTS"); (3) the ALJ improperly faulted Dr. O'Malley-Keyes for saying Plaintiff has "extensive" osteoarthritis; (4) the ALJ mistakenly relied on Dr. O'Malley-Keyes's clinical finding that reveals "mild swelling and tenderness;" and (5) the ALJ incorrectly disregarded Dr. O'Malley-Keyes's opinion that Plaintiff needs an assistive device for ambulation. Id. at 9-11.

Responding, Defendant asserts that "the ALJ had good cause to discount Dr. O'Malley-Keyes'[s] opinions based on their lack of support and inconsistency with other evidence, including her own treatment records." Def.'s Mem. at 7.

## B.   Applicable Law[6]

The Regulations establish a hierarchy among medical opinions[7] that provides a framework for determining the weight afforded each medical opinion.   See 20 C.F.R. § 404.1527. Essentially, "the opinions of a treating physician are entitled to more weight than those of a consulting or evaluating

---

[6]      On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844, 5,844 (January 18, 2017); see also 82 Fed. Reg. 15,132 (Mar. 27, 2017) (amending and correcting the final Rules published at 82 Fed. Reg. 5,844). Because Plaintiff filed her claim before that date, the undersigned cites the rules and Regulations that are applicable to the date the claim was filed.

[7]      "Medical opinions are statements from physicians or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1); see also 20 C.F.R. § 404.1502 (defining "[a]cceptable medical sources"); 20 C.F.R. § 404.1513(a).

health professional," and "[m]ore weight is given to the medical opinion of a source who examined the claimant than one who has not." <u>Schink v. Comm'r of Soc. Sec.</u>, 935 F.3d 1245, 1259, 1260 n.5 (11th Cir. 2019). Further, "[n]on-examining physicians' opinions are entitled to little weight when they contradict opinions of examining physicians and do not alone constitute substantial evidence." <u>Id.</u> at 1260 (citing <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280 (11th Cir. 1987) (per curiam)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. § 404.1527(c)(2)-(5); <u>see also</u> 20 C.F.R. § 404.1527(f), <u>Walker v. Soc. Sec. Admin., Comm'r</u>, 987 F.3d 1333, 1338 (11th Cir. 2021); <u>McNamee v. Soc. Sec. Admin.</u>, 164 F. App'x 919, 923 (11th Cir. 2006) (citation omitted) (stating that "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists").

With regard to a treating physician,[8] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c)(2). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Walker, 987 F.3d at 1338 (citation omitted); Schink, 935 F.3d at 1259; Hargress v. Soc. Sec. Admin.,

---

[8]     A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

Comm'r, 883 F.3d 1302, 1305 (11th Cir. 2018) (citation omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Walker, 987 F.3d at 1338; Schink, 935 F.3d at 1259; Hargress, 883 F.3d at 1305; Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An ALJ is required to consider every medical opinion. See 20 C.F.R. § 404.1527(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981) (citation omitted); see also 20 C.F.R. § 404.1527(c)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz, 825 F.2d at 279); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis v. Callahan, 125 F.3d at 1440.

## C.    Dr. O'Malley-Keyes's Treatment and Opinions

Dr. O'Malley-Keyes is Plaintiff's primary care physician at CareHere Clinic—City of Ocala Employee Clinic ("CareHere"). Tr. at 469. Plaintiff has been a patient at CareHere since 2009, Tr. at 318, but she did not see Dr. O'Malley-Keyes for the first time until October 28, 2015, Tr. at 284. Dr. O'Malley-Keyes treated Plaintiff several times before Plaintiff filed for DIB. Tr. at 273-84 (including on October 28, 2015; August 4, 2016; August 12, 2016; September 23, 2016; October 13, 2016; November 9, 2016; and November 29, 2016).[9]

Since August 2016, Dr. O'Malley-Keyes has been Plaintiff's primary doctor. See, e.g., Tr. at 272-78, 520-21, 528, 535-36, 547, 551, 560-61.[10] Dr. O'Malley-Keyes has treated Plaintiff for a number of ailments over the years, including allergic rhinitis, obesity, hypothyroidism, Type 2 diabetes mellitus, osteoarthritis, anxiety, chronic elevated white blood cell count, and skin rashes. See, e.g., Tr. at 273, 277, 279, 479-86.

### 1.    Dr. O'Malley-Keyes's Physical Examinations of Plaintiff

During almost every visit, Dr. O'Malley-Keyes has performed a Physical Examination ("PE(s)") of Plaintiff. See, e.g., Tr. at 480, 482, 484, 486. Dr.

---

[9]        Apparently, Dr. Jalal Kurdi and Dr. Nidal El Rimawi treated Plaintiff between November 2015 through June 2016. Tr. at 280-82. Todd Bergan, physician assistant-certified ("PA-C"), treated Plaintiff on September 1, 2016. Tr. at 278-79.

[10]        Mr. Bergan saw Plaintiff on September 1, 2016.

O'Malley-Keyes regularly has examined Plaintiff's head, eyes, and "general" physical state. See, e.g., Tr. at 273, 277, 480, 482, 484.[11] She has documented most of Plaintiff's PEs as "normal." See, e.g., Tr. at 276-82, 284, 480, 482, 484, 503, 551, 560-61, 572. If something during a PE has appeared "abnormal," Dr. O'Malley-Keyes has noted it. See, e.g., Tr. at 273 (December 12, 2016 record indicating PE was "abnormal" because Plaintiff's left wrist was tender), 277-80 (August 4, 2016; August 12, 2016; September 1, 2016; September 23, 2016; October 13, 2016 records indicating "skin" as "abnormal" because Plaintiff suffered from a rash during this time period).[12]

### 2.    Dr. O'Malley-Keyes's Opinions of Plaintiff's Osteoarthritis of the Left Knee

Plaintiff saw Dr. O'Malley-Keyes on October 13, 2016 for a refill of ibuprofen that Plaintiff "use[d] occasionally for knee pain." Tr. at 276.[13] Plaintiff's PE was "normal" for all categories, except for "skin" which was

---

[11]    Dr. O'Malley-Keyes did not include a "Musculoskeletal/Neurological" section in the PE portion of the treatment records. See, e.g, Tr. at 273, 276-78.

[12]    As noted, Dr. Kurdi and Dr. El Rimawi treated Plaintiff from November 15, 2015 to June 24, 2016. Tr. at 280-83. On November 5, 2015, Dr. Kurdi indicated Plaintiff's PE was "abnormal" as to Plaintiff's musculoskeletal area and wrote: "Left knee: mild lateral joint line tenderness, no crepitus, minimal tenderness over anserine bursa, McMurray's is negative. The patella does not slide smoothly in the groove. Calf is nontender." Tr. at 283. During this visit with Dr. Kurdi, Plaintiff received an injection to her left knee that allowed Plaintiff relief from her pain. Tr. at 283. Mr. Bergen performed the PE on September 1, 2016 and indicated "abnormal" for the "skin" because Plaintiff suffered from a rash. Tr. at 278. On February 18, 2016 and June 24, 2016 Dr. Kurdi also noted "abnormal" in the "general" section of the PE due to Plaintiff's weight, but the PEs were "normal" for all other categories. Tr. at 280, 282.

[13]    The administrative transcript contains duplicates of some medical records. The Court does not cite duplicates in this Opinion and Order.

"abnormal" due to a rash. Tr. at 277.

On November 9, 2016, Dr. O'Malley-Keyes ordered an X-ray of Plaintiff's knee because Plaintiff complained of left knee pain. Tr. at 275, 407. The X-ray showed moderate and mild osteoarthritis of the left knee. Tr. at 416. Dr. O'Malley-Keyes observed that Plaintiff was "limping," but there was "no redness/swelling, [or] heat in [the left] knee." Tr. at 275. Dr. O'Malley-Keyes indicated "normal" for all categories of the PE. Tr. at 276.

Dr. O'Malley-Keyes noted on December 12, 2016, that Plaintiff had "ongoing left knee pain that force[d Plaintiff] to use a cane," and for which she was financially unable to see an orthopedic physician. Tr. at 273. Dr. O'Malley-Keyes further indicated Plaintiff was taking Meloxicam for her knee pain. Tr. at 273. Plaintiff's PE was "normal" for all categories, except "extremities ('Ext.')" which was "abnormal" due to a tender left wrist. Tr. at 488.

On January 31, 2017, Dr. O'Malley-Keyes noted that Plaintiff was "in need of an ortho[pedic] appointment for chronic knee problems, but [Plaintiff] has [been] putting [the orthtopedic] off due to money." Tr. at 485. [14] She

---

[14] Dr. O'Malley-Keyes noted on a number of treatment records that Plaintiff was financially unable to see an orthopedic specialist for Plaintiff's knee problems. See, e.g, at 273, 485. Plaintiff does not argue in her Memorandum that the ALJ erred in not considering Plaintiff's financial situation relating to her left knee problems. The Court does not address this issue because Plaintiff failed to make this argument in her Memorandum; therefore, it is not properly before the Court. See, e.g., N.L.R.B. v. McClain of Ga., Inc., 138 F.3d 1418, 1422 (11th Cir. 1998) (stating that "[i]ssues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived"); see also T.R.C. ex

(Continued...)

indicated on Plaintiff's PE that her "Ext." was "abnormal," and Plaintiff was "using [a] cane secondary to chronic knee pain." Tr. at 485-86.

Dr. O'Malley-Keyes prescribed a refill for Meloxicam on February 27, 2017 that Plaintiff was "us[ing] daily for knee pain." Tr. at 483. Plaintiff's PE was "normal" for all categories except "skin" that was "abnormal" due to a rash. Tr. at 484. During Plaintiff's visits on March 21, 2017 and May 25, 2017, Dr. O'Malley-Keyes noted "normal" for all categories of Plaintiff's PE. Tr. at 480, 572.

On May 29, 2018, Dr. O'Malley-Keyes saw Plaintiff for a follow-up and noted that Plaintiff reported she had "ongoing knee pain [that was] worsening." Tr. at 520. It does not appear that a full PE was completed. Dr. O'Malley-Keyes ordered an X-ray of Plaintiff's left knee, Tr. at 512, which showed moderate osteoarthritis, Tr. at 515. Allison Onkala, PA-C, reviewed Plaintiff's X-ray of her left knee with Plaintiff on August 23, 2018 and wrote it was "significant" for osteoarthritis. Tr. at 503. Ms. Onkala noted "normal" for all categories of Plaintiff's PE. Tr. at 503.

---

rel. Boyd v. Comm'r, 553 F. App'x. 914, 919 (11th Cir. 2014) (citing McClain in a Social Security appeal and noting that the appellant "fail[ed] to develop any arguments demonstrating that the ALJ erred in his conclusions..."); see also Scheduling Order (Doc. No. 17), entered May 18, 2020, at 1 (directing parties to "identify with particularity the grounds upon which the administrative decision is being challenged," advising them that "[a]ny such challenges must be supported by citation to the record of the pertinent facts and by citations of the governing legal standards," and that "[a]ny contention for which these requirements are not met is subject to being disregarded for insufficient development").

### 3.   Dr. O'Malley-Keyes's Opinions of Plaintiff's Ambulation and the Need for an Assistive Device

On only two of Plaintiff's visits at CareHere did Dr. O'Malley-Keyes, or another health care worker, actually characterize in the PE portion of the medical records that Plaintiff's gait was "[a]bnormal." Tr. at 486, 511.[15] On January 31, 2017, Dr. O'Malley-Keyes indicated "[a]bnormal" (most likely referring to Plaintiff's gait) and noted that Plaintiff was "using [a] cane secondary to chronic knee pain." Tr. at 486. On July 5, 2018, Ms. Onkala noted Plaintiff's gait was "abnormal" and indicated that Plaintiff was "[a]mbulating with cane." Tr. at 511.

Dr. O'Malley-Keyes did sometimes make PE findings in the "Notes" and History of Present Illness ("HPI") sections of the medical records. See, e.g., 273-77, 521.  She noted on two occasions, November 9, 2016 and November 29, 2016, that Plaintiff was "limping." Tr. at 274, 275; see also Tr. at 465, 469 (indicating on disability paperwork that Plaintiff limps). Dr. O'Malley-Keyes documented on May 18, 2018 that Plaintiff was "using a cane." Tr. at 521 (noting PE finding in the "HPI" section of the medical records).

On March 21, 2017, Dr. O'Malley-Keyes noted in the "HPI" section of

---

[15]   On November 5, 2015, Dr. Kurdi noted "abnormal" regarding Plaintiff's left knee during her PE. Tr. at 283. However, it appears on this same visit that Plaintiff received an injection into her left knee. Tr. at 283. On February 18, 2016, Dr. Kurdi noted that Plaintiff's left knee was doing well "since the injection." Tr. at 282.

Plaintiff's records that Plaintiff's "left knee pain ha[d] worsened over several months[;] she now requires assisted ambulation at all times[;] she uses [a] cane when out in public, but switches to [a] wheelchair if extended walking needed[; and] she is using a walker at home." Tr. at 479; <u>see also</u> Tr. at 465. Dr. O'Malley-Keyes noted that while medications were helping Plaintiff's pain, "she still requires assisted ambulation." Tr. at 479.

Dr. O'Malley-Keyes first completed a temporary disabled parking pass for Plaintiff on December 15, 2016. Tr. at 565. On May 25, 2017, Dr. O'Malley-Keyes completed an application for a permanent disabled parking pass. Tr. at 566. On both applications, Dr. O'Malley-Keyes checked the box indicating an "[i]nability to walk without the use of or assistance from a brace, cane, crutch, prosthetic device, or other assistive device, or without assistance of another person." Tr. at 565-66. Dr. O'Malley-Keyes also marked the box indicating a "[s]evere limitation in a person's ability to walk due to an arthritic, neurological, or orthopedic condition." Tr. at 565-66.

### 4.   Dr. O'Malley-Keyes's Opinions of Plaintiff's CTS

During Plaintiff's visit on December 12, 2016, Dr. O'Malley-Keyes marked "abnormal" in the "Ext." portion of the PE and indicated Plaintiff's left wrist was "slight[ly] tender[, but] not hot/swollen/red." Tr. at 273. Plaintiff complained of "ongoing locking of fingers on both hands, and [they] discussed treatment options for [Plaintiff's] trigger finger." Tr. at 273. Dr. O'Malley-Keyes

16

also indicated that Plaintiff complained of "left wrist pain off and on" since Plaintiff injured it about six months earlier. Tr. at 273. However, Plaintiff was told that prior imaging (referring to the emergency department X-rays taken in summer 2016) of her wrist was normal. Tr. at 273.

Plaintiff complained of left wrist and hand pain on January 31, 2017 and stated that "recently the pain ha[d] been worse, and extend[ed] into her left hand." Tr. at 485. Dr. O'Malley-Keyes noted that Plaintiff had gone to the emergency room in summer 2016 and her X-ray completed then was normal. Tr. at 485. Dr. O'Malley-Keyes and Plaintiff discussed that the "pain may[ ]be secondary to [CTS]." Tr. at 485.

On March 21, 2017, Dr. O'Malley-Keyes wrote in the "HPI" section of the medical records that Plaintiff "suffers from [CTS] bilaterally which affects her ability to use hands for some tasks." Tr. at 479. On June 9, 2017, Dr. O'Malley-Keyes noted that Plaintiff complained of "feeling swollen in her hands and feet at times, especially with heat." Tr. at 560.

Dr. O'Malley-Keyes noted on May 18, 2018 that Plaintiff complained of hand pain. Tr. at 521. During a follow-up visit on May 29, 2018, Dr. O'Malley-Keyes indicated that Plaintiff "has ongoing . . . bilateral hand pain. Her hands ache and she sa[id] her fingers get 'stuck, pain worse with use (knitting etc.).'" Tr. at 520. The doctor requested X-rays be taken of Plaintiff's hands. See Tr. at 512. The X-rays showed both the right and left hands had "mild osteoarthritis

in the lateral carpus" and "minimally throughout the interphalangeal joints." Tr. at 513-14.

### 5. The RFC Questionnaire Completed by Dr. O'Malley-Keyes

On March 21, 2017, Dr. O'Malley-Keyes completed a Physical RFC Questionnaire containing opinions about Plaintiff's impairments and their effects on her ability to perform work-related functions. Tr. at 469-73. Dr. O'Malley-Keyes opined as follows. She listed Plaintiff's diagnoses as osteoarthritis of the left knee and CTS of the bilateral hands. Tr. at 469. She wrote that Plaintiff's symptoms were pain in the left knee with "secondary poor balance" and CTS "bilateral hands limiting repetitive use." Tr. at 469. Dr. O'Malley-Keyes described Plaintiff's left knee pain as "constant 2/10 if on meds, 5/10 with walking or prolonged sitting if on meds, [and] 8/10 if not on meds." Tr. at 469.

Dr. O'Malley-Keyes further identified the clinical findings and objective signs of Plaintiff's diagnoses as "limping, mild swelling/tenderness, extensive [osteoarthritis] on X-ray[, and indicated Plaintiff r]equires assisted ambulation." Tr. at 469. She also checked the "yes" box when asked if Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. Tr. at 470. Dr. O'Malley-Keyes checked the "seldom" box when asked if Plaintiff's experiences of pain or other symptoms were severe enough to interfere with attention and concentration. Tr. at 470.

As a result of Plaintiff's impairments, Dr. O'Malley-Keyes estimated Plaintiff's functional limitations if she were placed in a competitive work situation: Plaintiff could sit for 30 minutes and stand for 10 minutes at one time; Plaintiff could walk less than one city block; Plaintiff in an 8-hour workday could stand/walk for less than two hours and sit about two hours. Tr. at 470-71.

Dr. O'Malley-Keyes further indicated Plaintiff does not need to include periods of walking around during the workday, but she noted Plaintiff would need a job that permits shifting positions at will and sometimes Plaintiff would need unscheduled breaks. Tr. at 471. She estimated that Plaintiff would need to take unscheduled breaks approximately every 30 to 60 minutes and that Plaintiff would need approximately 30 minutes to rest before returning to work. Tr. at 471.

Dr. O'Malley-Keyes also noted that Plaintiff would need to elevate her legs to a height of "chair levels with pillows" for prolonged sitting and would have to elevate her legs approximately 25% of the time during an 8-hour workday. Tr. at 471. Finally, Dr. O'Malley-Keyes marked the "yes" box indicating Plaintiff must use a cane or other assistive device while walking/standing. Tr. at 471.

Dr. O'Malley-Keyes marked the boxes indicating that Plaintiff can "occasionally" lift and carry less than 10 pounds, "rarely" lift and carry 10

pounds, and "never" lift and carry above 20 pounds. Tr. at 471. Dr. O'Malley-Keyes further marked that Plaintiff can "rarely" twist or stoop (bend) and can "never" crouch or climb ladders or stairs. Tr. at 472.

Dr. O'Malley-Keyes answered "no" to the question "[d]oes your patient have significant limitations in doing repetitive reaching, handing, or fingering?" Tr. at 472. Dr. O'Malley-Keyes then opined that during an 8-hour workday Plaintiff can use her hands/fingers/arms; can use her right and left hands to grasp, turn, or twist objects only 10% of the day; use her hands for fine manipulations more than 10% but less than 25% of the day; and use both arms from a sitting position for reaching (including overhead) only 30% of the time. Tr. at 472.

Dr. O'Malley-Keyes answered "no" to the question "[a]re your patient's impairments likely to produce 'good days' and 'bad days'?" Tr. at 472. Dr. O'Malley-Keyes then marked that Plaintiff would be absent from work about three days per month due to her impairments or treatment. Tr. at 472.

## D.    The ALJ's Findings

The ALJ considered Dr. O'Malley-Keyes's "medical opinions regarding Plaintiff's functioning, her ability to work, her prognosis, and need for a disabled persons parking permit," along with Dr. O'Malley-Keyes's opinion that Plaintiff cannot do sedentary work and requires the use of a wheelchair, walker, or cane because of her left knee osteoarthritis. Tr. at 19. He concluded that her

opinions were "inconsistent with the evidence of record and her own clinical findings." Tr. at 19. The ALJ therefore gave "little weight" to Dr. O'Malley-Keyes's opinions. Tr. at 19.

> Specifically, the ALJ stated:

> > [Dr. O'Malley-Keyes's opinions are] inconsistent with examination findings and radiographic evidence indicating only a mild to moderate impairment. The record indicates that on examination [Plaintiff] was able to ambulate without difficulty. Dr. O'Malley-Keyes opines that [Plaintiff] has [CTS] bilaterally that limits her ability to repetitively use her hands. However, the evidence of record contains no objective imaging indicating that [Plaintiff] has [CTS]. Further, Dr. O'Malley-Keyes indicated that radiographic imaging reveals extensive osteoarthritis. However, imaging reveals that [Plaintiff] has no more than moderate osteoarthritis. Moreover, Dr. O'Malley-Keyes indicated that her clinical findings reveal that [Plaintiff] has only mild swelling and tenderness.

Tr. at 19 (citations omitted).

## E.   Analysis

After a thorough review of the record, the undersigned finds that the ALJ's reasons for discounting the opinions of Dr. O'Malley-Keyes are supported by substantial evidence. The following arguments made by Plaintiff, challenging the ALJ's handling of Dr. O'Malley-Keyes's opinions, are closely intertwined: (1) the ALJ wrongfully ignored Dr. O'Malley-Keyes's opinion that Plaintiff cannot ambulate without difficulty; (2) the ALJ improperly faulted Dr. O'Malley-Keyes for saying Plaintiff has "extensive" osteoarthritis; (3) the ALJ mistakenly relied on Dr. O'Malley-Keyes's clinical finding that reveals "mild

swelling and tenderness;" and (4) the ALJ incorrectly disregarded Dr. O'Malley-Keyes's opinion that Plaintiff needs an assistive device for ambulation. <u>See</u> Pl.'s Mem. at 9-11. Accordingly, these arguments are addressed together. Thereafter, Plaintiff's argument focusing on CTS is addressed.

### 1.   Osteoarthritis, Ambulation, and Swelling/Tenderness

Substantial evidence supports the ALJ's decision to give "little weight" to Dr. O'Malley-Keyes's opinion that Plaintiff has "extensive" osteoarthritis and that Plaintiff needs an assistive device to ambulate. Tr. at 19. Moreover, the ALJ's analysis of Dr. O'Malley-Keyes's findings, regarding "mild swelling and tenderness," is supported by substantial evidence. Tr. at 19. The ALJ correctly found that her opinions are "inconsistent with the evidence of record and her own clinical findings." Tr. at 19.

As noted, Dr. O'Malley-Keyes stated on the RFC Questionnaire that Plaintiff has "extensive" osteoarthritis. Tr. at 469. The ALJ, however, discussed imaging that conflicted with this characterization by Dr. O'Malley-Keyes. Tr. at 19. On October 23, 2015, an X-ray of Plaintiff's left knee showed she had "[m]ild osteoarthritis." Tr. at 378. Another X-ray taken on November 9, 2016, of Plaintiff's left knee showed "'moderate' osteophytic spurring of the patella and tibial tubercle," as well as "'mild' osteophytic spurring of the medial and lateral compartments." Tr. at 416. "Moderate" and "mild" joint space narrowing was also found. Tr. at 416.

Additional imaging on May 29, 2018 of Plaintiff's left knee "demonstrate[d] moderate tricompartmental joint space narrowing," "moderate osteophytic spurring of the upper and lower poles of the patella anteriorly," "mild osteophyte formation at the periphery of the medial and lateral compartments and in the posterior upper and lower poles of the patella," "no evidence of fracture or joint effusion," and "moderate osteophytic spurring of the tibial tubercle." Tr. at 515. The conclusion from this imaging was "**[m]oderate** osteoarthritis [of the] left knee." Tr. at 515 (emphasis added).

The undersigned could not find any treatment records in which Dr. O'Malley-Keyes noted that Plaintiff's osteoarthritis was "extensive," although Ms. Onkala did note that the May 2018 X-rays were "significant" for osteoarthritis. Tr. at 503. On March 21, 2017, Dr. O'Malley-Keyes noted that Plaintiff's knee pain had "worsened," but the X-ray completed in May 2018 (more than a year later) showed Plaintiff's osteoarthritis was still moderate. Tr. at 479, 515. Thus, the ALJ's rejection of Dr. O'Malley-Keyes's characterization of "extensive" osteoarthritis in Plaintiff's left knee is supported by substantial evidence.

Regarding the use of a hand-held assistive device, Social Security Ruling ("SSR") 96-9p states:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held

> assistive device to aid in walking or standing, and describing the
> circumstances for which it is needed (i.e., whether all the time,
> periodically, or only in certain situations; distance and terrain; and
> any other relevant information). . . .
>
> In these situations, too, it may be especially useful to consult a
> vocational resource in order to make a judgment regarding the
> individual's ability to make an adjustment to other work.

SSR 96-9P, 1996 WL 374185, at *7 (SSA 1996).

The ALJ properly relied on medical records from a July 16, 2016

emergency department visit[16] just four months prior to the alleged onset date

and also relied on Dr. O'Malley-Keyes own records in giving "little weight" to

her opinion that Plaintiff needs an assistive device to ambulate. Tr. at 19; see

Tr. at 443-55 (emergency department records), 177 (onset date); see also Garrett

v. Comm'r of Soc. Sec., No. 6:16-cv-01516-CEM-GJK, 2017 WL 1460733, at *3

(M.D. Fla. Mar. 15, 2017) (unpublished) (recognizing that "[c]ourts within the

Eleventh Circuit have found pre-onset date evidence to be significant so long as

such evidence is: 1) within close proximity to the onset date; and 2) relevant to

a claimant's impairments"), report and recommendation adopted, No. 6:16-cv-

1516-CEM-GJK, 2017 WL 1438321 (M.D. Fla. Apr. 24, 2017) (unpublished);

Nichols v. Comm'r of Soc. Sec., No. 6:16-cv-1819-DCI, 2018 WL 746940, at *3

(M.D. Fla. Feb. 7, 2018) (unpublished) (recognizing that "even when an opinion

---

[16]     It appears that Plaintiff visited the emergency department due to left arm and
wrist pain that began two days prior to her hospital visit. See Tr. at 447.

significantly predates a claimant's alleged onset date such that the opinion is of limited relevance, courts in [the Eleventh Circuit] have required the ALJ to weigh the opinion"; collecting cases); <u>Hamlin v. Astrue</u>, No. 3:07-cv-507-TEM, 2008 WL 4371326, at *4 (M.D. Fla. Sept. 19, 2008) (unpublished) (finding the ALJ erred in not considering evidence that predated the plaintiff's alleged disability onset date because although "such evidence may be of little relevance, . . . it still is of relevance" (citation omitted)).

The ALJ cited medical records from the July 2016 emergency department visit where Plaintiff's ambulation was specifically assessed. Tr. at 19. It is noted in these records (under the Nursing Assessment, Musculoskeletal/Extremities) that Plaintiff "[a]mbulate[d] without difficulty." Tr. at 443.

Substantial evidence supports the ALJ's finding that Dr. O'Malley-Keyes's opinions are "inconsistent with examination findings . . . ." Tr. at 19. A review of Dr. O'Malley-Keyes's records indicates she rarely noted during Plaintiff's PEs that Plaintiff's gait or ambulation was "abnormal." Tr. at 486, 511, 521. Moreover, most of Dr. O'Malley-Keyes's notes indicate that Plaintiff was in no acute distress and Plaintiff's strength and sensation were grossly intact. <u>See, e.g.</u>, Tr. at 273, 277-79, 480,482, 484, 488, 503, 528, 536, 547.

Dr. O'Malley-Keyes wrote on the RFC Questionnaire that she "prescribed" Plaintiff an assistive device, but the undersigned can find no medical records showing that the doctor did prescribe any assistive device. Tr.

at 473. It is also unclear from the administrative transcript which assistive device the doctor is claiming to have prescribed. Tr. at 473. While Dr. O'Malley-Keyes did indicate on Plaintiff's temporary and permanent disability parking pass applications that Plaintiff needed an assistive device, the ALJ considered this evidence and disagreed with its conclusion. Tr. at 19, 565-66.

During many visits, instead of Dr. O'Malley-Keyes assessing Plaintiff's gait and ambulation, it appears Plaintiff was explaining her subjective belief that she needed an assistive device for ambulation.[17] See, e.g., Tr. at  273 (noting on December 12, 2016 that ongoing left knee pain now forces Plaintiff to use a cane), 274 (stating on November 29, 2016 that Plaintiff uses a walker at home), 275 (documenting on November 9, 2016 that Plaintiff is using walker at home), 483 (indicating on February 27, 2017 that Plaintiff got a wheelchair to help her get around places that would require a lot of walking), 561 (explaining on May 25, 2017 that Plaintiff continues to use a cane). Therefore, most of the documentation surrounding Plaintiff's claim that she needs an assistive device for ambulation is based on Plaintiff's self-reporting.

Finally, there is substantial evidence supporting the ALJ's conclusion that Dr. O'Malley-Keyes's clinical finding that indicates Plaintiff has "mild

---

[17]    Plaintiff does not dispute the ALJ's assessment of Plaintiff's subjective complaints surrounding her alleged disability. See Tr. at 19. For this reason, the Court does not address Plaintiff's subjective claims regarding her alleged disability. See supra note 14.

swelling and tenderness" is inconsistent with Dr. O'Malley-Keyes's opinion that Plaintiff has "extensive" osteoarthritis. Tr. at 19. Dr. O'Malley-Keyes indicated on Plaintiff's November 9, 2016 visit that Plaintiff was "limping," but there was "no redness/swelling heat in knee." Tr. at 275. Further, when specifically asked to identify the clinical findings and objective signs related to Plaintiff's diagnoses, Dr. O'Malley-Keyes wrote on the RFC Questionnaire, "mild swelling/tenderness." Tr. at 469.

Plaintiff points out that on March 21, 2017, Dr. O'Malley-Keyes noted in the "HPI" section of the treatment records that Plaintiff cannot walk or stand for prolonged time periods and must elevate her legs while sitting to relieve her pain. Pl.'s Mem. at 10-11; see Tr. at 479. Apparently, though, this statement by Dr. O'Malley-Keyes was based on Plaintiff's subjective reports. See Tr. at 479. The PE on this same date appeared normal, and Dr. O'Malley-Keyes noted no abnormalities. Tr. at 479. Also, Dr. O'Malley-Keyes completed the RFC Questionnaire during this same visit and indicated that Plaintiff had only mild swelling and tenderness. Tr. at 469, 479.

Plaintiff further points out that Dr. O'Malley-Keyes "observed that Plaintiff had significant edema 'due to obesity/varicosities.'" Pl.'s Mem. at 11. Plaintiff apparently is referring to a treatment note from a visit on October 30, 2017, but Dr. O'Malley-Keyes did not indicate in the note that the edema itself was significant. Tr. at 536.

27

Based on the foregoing, the ALJ's decision to give "little weight" to Dr. O'Malley-Keyes's opinions surrounding Plaintiff's ambulation and the need for an assistive device is supported by substantial evidence.

### 2.   The ALJ found no objective imaging confirmed Dr. O'Malley-Keyes's diagnosis of CTS

There is substantial evidence to support the ALJ's rejection of Dr. O'Malley-Keyes's opinion that Plaintiff suffers from CTS bilaterally, that limits the use of her hands. As the ALJ noted, there is no objective imaging of Plaintiff's hands that show CTS is present. Tr. at 19. The X-rays on May 29, 2018 of Plaintiff's hands showed "mild osteoarthritis" and that the "soft tissues are normal." Tr. at 513-14. While Dr. O'Malley-Keyes opined Plaintiff has CTS, see, e.g., Tr. at 465, 469, 479-80, 485, the May 2018 X-rays indicate differently, Tr. at 513-14 (showing mild osteoarthritis in left and right hands).

Plaintiff asserts that "[a]fter [Dr. O'Malley-Keyes] completed [her] opinion[ ], she referred Plaintiff for X-rays that revealed Plaintiff had **mild osteoarthritis** of the lateral carpus in both wrists as well as minimal osteoarthritis throughout the interphalangeal joints." Pl.'s Mem. at 9-10 (emphasis added). [18] Plaintiff argues that "[w]hile the imaging **did not corroborate Dr. O'Malley-Keyes's initial finding of [CTS]**, Plaintiff's

---

[18]   It is unclear which specific opinion, pre-dating the May 2018 X-rays of Plaintiff's hands, Plaintiff is referring to in her Memorandum.

bilateral hand and wrist osteoarthritis would reasonably be expected to cause the hand pain . . . as well as the lifting and manipulative limitations . . . ." <u>Id.</u> at 10 (emphasis added). Plaintiff recognizes that Dr. O'Malley-Keyes diagnosed her with CTS before any imaging was completed, but when the imaging of her hands was performed, it did not show CTS. <u>Id.</u>

Based on the foregoing, the ALJ's decision to give "little weight" to Dr. O'Malley-Keyes's opinions surrounding Plaintiff's alleged CTS is supported by substantial evidence.

## V.   Conclusion

After a thorough review of the entire record, the undersigned finds that the ALJ's Decision is supported by substantial evidence. Accordingly, it is

**ORDERED**:

1.     The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the Commissioner's final decision.

2.     The Clerk is further directed to close the file.

**DONE AND ORDERED** in Jacksonville, Florida on March 19, 2021.

JAMES R. KLINDT
United States Magistrate Judge

29

keb
Copies:
Counsel of Record